635 So.2d 690 (1994)
In The MATTER OF RECOVERY I, INC.
No. 93 CA 0441.
Court of Appeal of Louisiana, First Circuit.
April 8, 1994.
*691 Daria Burgess-Diaz, Tulane Environmental Law Clinic, New Orleans, for appellants Vietnamese American Voters Assoc., Village de L'Est Homeowner's Assoc., Louisiana Environmental Action Network, etc.
Meredith Lieux, Office of Legal Affairs and Enforcement, Baton Rouge, for appellee State of Louisiana thru the Dept. of Environmental Quality.
Gerald L. Walter, Jr., Baton Rouge, for appellee.
Before LOTTINGER, C.J., and CRAIN and LEBLANC, JJ.
LOTTINGER, Chief Judge.
This appeal arises as a result of a settlement agreement reached by the Louisiana Department of Environmental Quality (DEQ), Recovery I, Inc. (Recovery), and the City of New Orleans that allows a nonhazardous solid waste disposal site to reopen in New Orleans. The Tulane University Environmental Law Clinic (Tulane), as the legal representative of a number of civic and environmental organizations opposed to the reopening of the waste site, intervened.[1] Contending *692 that the DEQ erred by ratifying the agreement which allows the waste site to be reopened, Tulane appeals to this court.

FACTS
Recovery I is a nonhazardous solid waste disposal site encompassing sixty acres in eastern New Orleans. The facility is owned by the City of New Orleans. In 1974, Recovery executed a contract with the City of New Orleans. Pursuant to the contract, Recovery constructed and operated the facility. However, the contract provided that the closure of the facility was the responsibility of the City of New Orleans. Further, the facility only received solid waste from the City of New Orleans. On March 14, 1986, the DEQ issued Recovery a standard permit to operate the facility. The permit expired on October 17, 1988.
Early in 1988, Recovery submitted a permit application to the DEQ. However, in June of 1988, the City of New Orleans decided that it would not renew the contract it had with Recovery that expired on October 17, 1988. Instead, the City of New Orleans considered whether the operation of the facility would continue. Furthermore, the City of New Orleans considered whether Recovery I should be a city-operated facility. Accordingly, Recovery withdrew its permit application.
On October 7, 1988, the DEQ deferred the final closure of Recovery I until December 21, 1988, to allow the City of New Orleans to complete its plan for the continued operation and ultimate closure of the facility. On October 17, 1988, all operations at the facility ceased. Thereafter, the City of New Orleans took custody of the facility and entered discussions with the DEQ. However, the City of New Orleans did not complete the plan for the operation and closure of the facility.
On April 12, 1990, after it became evident that the City of New Orleans would not finalize a closure plan, the DEQ issued a Compliance Order to Recovery. The Compliance Order directed Recovery, as the former permit holder, to submit a closure plan within thirty days. Furthermore, the Compliance Order stipulated that Recovery must close the facility within one year of the approval of the plan. Hence, the DEQ contended that Recovery must shoulder the responsibility of closing the facility. Recovery requested a hearing on the Compliance Order. The matter was referred to the DEQ administrative hearing office.
Recovery claimed that pursuant to the contract it executed with the City of New Orleans, the City of New Orleans assumed responsibility for the closure of the facility. Furthermore, by illuminating the previous actions of the DEQ and the City of New Orleans, Recovery buttressed its position that the closure of the facility was the responsibility of the City of New Orleans. However, the DEQ did not agree with Recovery. Moreover, the City of New Orleans indicated that it was not able to pay for a proper closure of the facility.
During the pendency of the proceedings, the City of New Orleans and Recovery suggested that the most effective means to achieve closure was to allow the facility to reopen for a limited period of time. The City of New Orleans represented that this approach would be advantageous to it for two reasons. First, because a reopening would provide the city with an additional waste site, its disposal costs would be lower. Second, because Recovery would assume the cost associated with the closure, it would save the city approximately eight million dollars. Accordingly, it was generally agreed that allowing the facility to reopen for a limited period of time to accomplish the closure would be in the best interest of all the parties and the environment. Thus, the DEQ, the City of New Orleans, and Recovery reached a settlement.
In May of 1992, the DEQ published notice that it was accepting public comment on the proposed settlement agreement. Thereafter, *693 the DEQ, Recovery, and the City of New Orleans finalized and approved the settlement, evidenced by the "Compromise Agreement."[2] Under the terms of the agreement, Recovery would operate the facility for a period of three years. Further, the funds generated from the operation would be used by Recovery to pay for a proper closure of the facility. Moreover, the agreement fully settled all issues presented under this matter, which included the Compliance Order.
Tulane intervened on behalf of a number of civic and environmental organizations opposed to the agreement. Tulane filed a motion seeking that the Secretary of the DEQ, pursuant to La.R.S. 30:2024(C), grant an appeal to this court.[3] However, the motion was denied under the contention that the agreement was not a "final decision." Tulane immediately applied to this court for supervisory writs. This court granted Tulane's supervisory writ application. Accordingly, we ordered the DEQ to sign the order for the appeal and to forward the record to this court. This appeal followed.

ASSIGNMENTS OF ERROR
Tulane submits seven assignments of error. Tulane maintains: (1) The DEQ erred by allowing Recovery to reopen the facility under the Compromise Agreement without securing a permit; (2) the DEQ erred by approving the Compromise Agreement because the DEQ's approval exceeds its statutory and regulatory authority; (3) the DEQ erred by approving the Compromise Agreement without securing the attorney general's concurrence because the agreement waives penalties to which the DEQ is entitled; (4) the DEQ erred by approving the Compromise Agreement because the agreement divests the DEQ of its constitutional duty that it owes to the public as the trustee of the environment; (5) the DEQ's approval of the Compromise Agreement was arbitrary and capricious, characterized by an abuse of discretion, because evidence indicates that the proposed method of closing the facility is technically unsound and will result in failure; (6) the DEQ's approval of the Compromise Agreement was arbitrary and capricious, characterized by an abuse of discretion, because the record fails to justify a three year period to finance the closure of the facility; and (7) the DEQ erred by approving the Compromise Agreement because it failed to consider more environmentally sound alternatives to reopening the facility.
Additionally, Recovery submits two assignments of error. Recovery maintains: (1) This court lacks subject matter jurisdiction over this case because the Compromise Agreement is not a "final decision or order of the secretary" of the DEQ; and (2) thirteen of the fifteen civic and environmental organizations lack standing to appeal.

ISSUES
The above specified assignments of error raise the following questions for review: First, does the DEQ's approval of the Compromise Agreement constitute a "final decision or order" as contemplated by La.R.S. 30:2024(C)? Second, do thirteen of the fifteen civic and environmental organizations opposed to the Compromise Agreement lack standing to appeal? Third, did the DEQ exceed its statutory and regulatory authority by approving the Compromise Agreement, *694 thus divesting itself of the constitutional duty it owes to the public? Fourth, did the DEQ violate the Solid Waste Regulations by allowing Recovery to operate the landfill facility without a permit? Fifth, was the attorney general's concurrence to the Compromise Agreement necessary? Sixth, was the DEQ's approval of the Compromise Agreement arbitrary and capricious?

I
Recovery submits that this court lacks subject matter jurisdiction over this case. Specifically, Recovery argues that the Compromise Agreement is not a "final decision or order of the secretary" as defined by La.R.S. 30:2024(C).
Previously, we addressed Recovery's same contention in this case. In In the Matter of Recovery I, Inc., 622 So.2d 272, 275 (La.App. 1st Cir.), writ denied, 629 So.2d 383 (La. 1993), we held that "a settlement agreement is a final decision or order of the DEQ which is subject to appeal by an aggrieved person under La.R.S. 30:2024(C)."
Therefore, Recovery's assignment of error is without merit.

II
Recovery submits that thirteen of the fifteen civic and environmental organizations represented by Tulane lack standing to appeal. Specifically, Recovery argues that the Louisiana Environmental Action Network, Southern Christian Leadership Conference, St. Bernard Citizens for Environmental Quality, Association of Community Organizations for Reform Now, Gulf Coast Tenants Organization, St. Bernard Sportsmen's League, Women for a Better Louisiana, Friends of the Lake, Orleans Audubon Society, League of Women Voters of New Orleans, Delta Greens, Versailles Arms Residents Advisory Council, and Citizens Action of Louisiana have not established their "aggrieved status" pursuant to La.R.S. 30:2024(C). Accordingly, Recovery contends that these organizations should be dismissed.
In In the Matter of BASF Corporation, Chemical Division, 533 So.2d 971, (La. App. 1st Cir.1988), this court stated that civic and environmental groups have a right to appeal a final decision of the DEQ if they are aggrieved. To be aggrieved, "a party must have a real and actual interest which is or may be adversely affected by the DEQ's decision." Id. at 973.
In BASF, a civic group and an environmental group alleged that they were aggrieved by a DEQ decision. The groups claimed that their purposes were to enjoy the nation's outdoors and that their purposes were diminished by illegal chemical releases. Further, the groups claimed that the illegal chemical releases affected and endangered Ascension Parish and its residents. Hence, the groups claimed that their members suffered injury in that their physical well-being and the aesthetics of their domiciles were diminished by the chemical releases. Accordingly, this court found that the groups alleged a real and actual interest in the object of the appeal in that their health and well-being were at risk as well as that of their community. Id., at 974.
Similarly, in the case at hand, Tulane asserted that all of the civic and environmental organizations that it represents are "aggrieved" by the DEQ's decision to approve the Compromise Agreement. In its motion for appeal, Tulane contended that many of the members of the organizations "live, work and recreate" in the area where the Recovery I landfill is located. Further, Tulane contended that the health and welfare of the organizations and their members will be adversely affected by the agreement. Tulane contended that the reopening of the Recovery I landfill will expose the organizations' members to air, water, and solid waste pollution in addition to their exposure to the increased noise, odor, and traffic. Hence, Tulane asserted that under the Compromise Agreement the members of the organizations will suffer in that "their well being and the aesthetics of their domiciles and recreational areas will be further diminished." Moreover, Tulane asserted that the area wildlife, which the organizations' members observe and hunt, are threatened by the reopening of Recovery I.
We find that Tulane has sufficiently alleged grievances indicating that the civic and *695 environmental organizations that it represents have a real and actual interest in the object of this appeal. Furthermore, we find that the allegations made by Tulane in its motion for appeal apply to all of the civic and environmental organizations that it represents. Thus, in light of our decision in BASF and the allegation made by Tulane, we find that the thirteen civic and environmental organizations that Recovery claims lack standing to appeal this matter have established that they are "aggrieved" within the context of La.R.S. 30:2024(C).
Therefore, Recovery's assignment of error is without merit.

III
Through assignments of error numbers 2 and 4, Tulane submits that the DEQ exceeded its statutory and regulatory authority by approving the Compromise Agreement, thus divesting itself of its constitutional duty. Although Tulane fails to specify in what manner the DEQ exceeded its authority, Tulane argues that the Compromise Agreement abridges the DEQ's duty to safeguard the environment.
As set forth in greater detail below, the legislature fulfilled its constitutional obligation and created the DEQ to act as the trustee of our environment. Further, the legislature enacted the Louisiana Environmental Quality Act and delegated authority to the DEQ to settle environmental matters. See, e.g., La.R.S. 30:2025(H). However, despite the DEQ's authority to settle environmental matters, Tulane maintains that Section 5 of the Compromise Agreement divests the DEQ of its power.
Section 5 of the Compromise Agreement reads, in full, as follows:
5. The obligations undertaken by Recovery I, Inc. pursuant to this agreement shall be in full settlement and satisfaction of the compliance order issued to Recovery I, Inc. in the above entitled matter and any violations alleged by La. DEQ relative to Recovery I, arising on or before the effective date of this compromise agreement. Any future authority or responsibility of Recovery I, Inc. or the City to La. DEQ shall be pursuant solely to this settlement agreement, the Closure Plan, and the agreement between the City and Recovery I, Inc.
We do not interpret the above quoted language to mean that the DEQ is powerless to act beyond the provisions of the Compromise Agreement. Instead, we find that the terms of the Compromise Agreement mandate that the parties are governed by the laws stipulated in the Louisiana Environmental Quality Act. Accordingly, Section 9 of the Compromise Agreement provides, in part, that "[i]n the event that any party fails to comply with the requirements of this section without good cause shown, ... the failure to comply shall be deemed a violation of the Environmental Quality Act and the party shall be subject to the penalties therefor." Moreover, Section 10 of the Compromise Agreement provides, in full, as follows:
10. If at any time additional information, tests, or analyses indicate areas of concern which present a threat to the environment, La. DEQ reserves the right to require more information, testing, analyses and/or remedial actions to address such concerns. The parties have provided to each other all information concerning the site as of the date of this agreement. La. DEQ further reserves the right to modify the terms and conditions of this agreement in the event that La. DEQ receives new information, which was not available to the La. DEQ at the time of this agreement, concerning the scientific determinations on which the Settlement Agreement was premised, to include, but not limited to, health effects associated with level of exposure, toxicity of hazardous substances, and the appropriateness of remedial technologies for conditions at the site.
Thus, because the terms of the Compromise Agreement reserve the right of the DEQ to protect the environment and to combat violations of the agreement with the provisions of the Louisiana Environmental Quality Act, we conclude that DEQ's approval of the Compromise Agreement is not in excess of the DEQ's authority and does not divest the DEQ of its duty as trustee of our environment.
*696 Therefore, Tulane's assignments of error are without merit.

IV
Through assignment of error number 1, Tulane submits that the DEQ's approval of the Compromise Agreement violates the DEQ's Solid Waste Regulations. Specifically, Tulane argues that the Solid Waste Regulations promulgated by the DEQ mandate that all solid waste facilities must obtain a permit to operate. Further, Tulane maintains that the Recovery I landfill is not an "existing facility," which is exempt from the permit requirement, contending that on March 14, 1986, the DEQ classified Recovery I as a "new" facility. Tulane avers that on October 17, 1988, Recovery's permit expired and Recovery I became an unpermitted solid waste facility. Hence, Tulane construes the Solid Waste Regulations to mean that solid waste cannot be disposed of at Recovery I because Recovery did not receive a permit to operate the facility. Thus, Tulane concludes that the DEQ violated its own regulations by allowing Recovery to operate the Recovery I landfill under the Compromise Agreement without a permit.
However, the DEQ asserts that the Recovery I landfill is an "existing facility" which can continue to operate until closure. Hence, the DEQ takes the position that under the Solid Waste Regulations, Recovery was not required to secure a permit to operate the landfill. Likewise, Recovery asserts that the Recovery I landfill is an "existing facility." Thus, Recovery takes the position that the Solid Waste Regulations do not mandate that it receive a new permit to accomplish the goals of the Compromise Agreement.
Considerable weight should be afforded to an administrative agency's construction of a statutory scheme that it is entrusted to administer and deference must be awarded to its administrative interpretations. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984).
In light of the judicial standard of review pertaining to an administrative agency's construction and interpretation of federal legislation, we decide that the same standard of review must be afforded to the DEQ regarding the construction and interpretation of the rules and regulations under its authority. We believe that an agency such as the DEQ should be entitled to deference regarding its interpretation and construction of the rules and regulations that it promulgates. Where the legislature has authorized the DEQ to promulgate rules and regulations, such is analogous to the situation where Congress has explicitly left a void for a federal agency to fill. Accordingly, we find that the DEQ's interpretations should stand unless they are arbitrary, capricious, or manifestly contrary to its rules and regulations.
LAC 33:VII.901.F provides that "[s]olid waste shall be disposed only in accordance with these regulations, and only at facilities permitted to receive such waste." LAC 33:VII.1105.A.1 mandates that "[o]perators of all facilities which process or dispose of solid waste must secure a permit." However, LAC 33:VII.1105.B.1 provides that "[o]nly those facilities which are classified for upgrading by the office may apply for a permit." Further, LAC 33:VII.1105.B.2 stipulates that "[f]acilities classifed [sic] for closure will be issued a closure compliance order which will have a specific expiration date."
LAC 33:VII.1105.B.2 provides that "[t]he facility may continue to operate until closure (Refer to LAC 33:VII.1109.C)." LAC 33:VII.1109.C.1 states that the purpose behind LAC 33:VII.1109.C is "[t]o set a schedule wherein all existing solid waste disposal facility [sic] classified for closure shall be closed by January 20, 1986." Meanwhile, LAC 33:VII.1109.C.2 articulates the procedure for achieving this goal. Accordingly, LAC 33:VII.1109.C.2.a provides that "[a]fter classification of the facility for closure in accordance with the provisions of these regulations, the commission shall issue a closure compliance order requiring closure of the facility within a specified amount of time." LAC 33:VII.1109.C.2.b provides that "[t]he closure compliance order shall also require the operator to submit plans for closure and interim operation of the facility." Further, LAC 33:VII.1109.C.2.b states that "[c]losure *697 and interim operation of the facility shall be in accordance with the plans as approved by the assistant secretary."
LAC 33:VII.1107.A.2.b provides that "[t]he assistant secretary shall issue an interim permit with an appropriate permit application form to operators of facilities classified for upgrading." LAC 33:VII.1107.A.2.b concludes that "[t]he interim permit allows for the continued operation of the facility until a standard permit is issued or denied by the commission." Yet, LAC 33:VII.1107.A.2.c provides that "[t]he commission shall issue a closure compliance order to operators of facilities which cannot be upgraded." LAC 33:VII.1107.A.2.c concludes that "[t]he order requires closure of the facility within a specified length of time."
Considering the above quoted Solid Waste Regulations, the question arises as to whether the Recovery I landfill facility was classified "for upgrading" or "for closure." If Recovery I was classified for upgrading, Recovery would have had to apply for a permit. While Recovery's permit application was being reviewed, the DEQ would have issued Recovery an interim permit to operate the Recovery I landfill until a standard permit is issued or denied. However, if Recovery was classified for closure, the DEQ would have issued Recovery a closure compliance order requiring Recovery I to close within a specified length of time.
After reviewing the record, which largely consists of correspondence between the DEQ and Recovery and the City of New Orleans, we are uncertain whether Recovery I was classified for upgrading or for closure. We find that it is not clear which scheme applies to Recovery I because neither scheme fits squarely with the facts of this matter. On one hand, the DEQ issued Recovery a standard permit on March 14, 1986, which expired on October 17, 1988. On the other hand, the DEQ issued Recovery a compliance order on April 12, 1990, ordering Recovery to submit closure plans within thirty days and to close within one year of the approval of the plans. Hence, it is reasonable to interpret the DEQ order to mean that Recovery was to close the facility within a specific length of time.
Despite the two possible interpretations which exist, we are inclined to side with the DEQ's interpretation and construction of the Solid Waste Regulations stipulating that a permit was not required because Recovery I was an "existing facility." Because the DEQ drafted and promulgated the Solid Waste Regulations with the authorization of the Louisiana Legislature, considerable weight and deference must be accorded to the DEQ's interpretation of its own regulations. We believe that the situation posed by an agency's interpretation of the rules and regulations which it drafted is analogous to the situation where the legislature has enacted a statute and explicitly left a void for the agency to fill. Thus, because the DEQ's interpretation of the Solid Waste Regulations is not arbitrary, capricious, or manifestly contrary to the regulations, we affirm the DEQ's interpretation.
Moreover, we take notice that LAC 33:VII.703 provides that "[a]ny person subject to these regulations who generates, treats, stores, transports, or disposes of solid waste may petition the assistant secretary for exemption from these regulations or any portion thereof." Hence, the Solid Waste Regulations promulgated by the DEQ allows the DEQ to exempt the operator of a waste disposal facility from the regulations. Although we are unable to locate in the record evidence which illustrates that the DEQ exempted Recovery from the Solid Waste Regulations, specifically the permit requirement, the regulations do not articulate any procedural scheme to be followed to exempt a petitioner. Thus, assuming for the purpose of argument that Recovery was required to seek a permit, because the record contains several requests by Recovery for permission to continue operating Recovery I, it is reasonable to conclude that the DEQ may have exempted Recovery from the permit requirement.
Therefore, Tulane's assignment of error is without merit.

V
Through assignment of error number 3, Tulane submits that the DEQ was required *698 to secure the attorney general's concurrence to the Compromise Agreement. Specifically, Tulane argues that because the Compromise Agreement waives penalties, the law requires that the attorney general must concur. Hence, relying on case law promulgated by this court, Tulane maintains that the Compromise Agreement must be vacated. Furthermore, Tulane hints that the attorney general must concur to all of the DEQ's settlements, regardless of whether penalties are involved. However, the DEQ and Recovery contend that because the Compromise Agreement did not involve any issue pertaining to penalties, the attorney general's concurrence was not required.
At the time the Compromise Agreement was approved, La.R.S. 30:2025(H)[4] provided as follows:
Except as otherwise provided herein, the commission or secretary, with the concurrence of the attorney general, may settle or resolve as deemed advantageous to the state any suits, disputes, or claims for any penalty under any provision of this Subtitle or the regulations or permit or license terms and conditions applicable thereto.
In In the Matter of BASF Corporation, Chemical Division, 538 So.2d 635, 637 (La. App. 1st Cir.1988), writ granted, 539 So.2d 624, writ denied, 541 So.2d 900 (La.1989), the DEQ and BASF agreed to a civil penalty "in settlement of the alleged violations." However, we vacated the DEQ's penalty assessment because the DEQ failed to obtain the concurrence of the attorney general to the settlement. Id. at 644-45. Thus, because the settlement was not in accordance with the law, we ordered the DEQ to secure the attorney general's concurrence on the penalty assessment. Id. at 645-46.
Tulane relies heavily on BASF, contending that the situation posed in this case is "strikingly similar." Hence, Tulane asserts that the Compromise Agreement waived penalties that the DEQ was entitled to collect. However, our review of the record, including the Compromise Agreement, fails to discover any evidence supporting Tulane's assertion that penalties are at issue in this matter. In fact, our review of the record reflects that the Compromise Agreement settled the April 12, 1990 Compliance Order, which did not involve penalties. Thus, because penalties were not a feature of the Compromise Agreement, Tulane's reliance on BASF is grossly misplaced.
Moreover, we take notice that in BASF, we stated:
When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject.
538 So.2d at 644 (quoting Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La. App. 1st Cir.1984)).
In light of the jurisprudential guidance for interpreting a statute, we find that the "for *699 any penalty" clause mandates that the attorney general's concurrence is required to settlements of suits, disputes, or claims involving a penalty. Hence, we do not interpret La.R.S. 30:2025(H) to mean that the attorney general must concur in every settlement approved by the DEQ. Otherwise, we would circumvent the legislature's will by unduly hindering the vested authority of the DEQ as the trustee of our environment and render the "for any penalty" clause to be nothing more than meaningless or superfluous language. Accordingly, we hold that because the Compromise Agreement did not involve penalties, the DEQ was not required to secure the attorney general's concurrence.
Therefore, Tulane's assignment of error is without merit.

VI
Through assignments of error numbers 5, 6, and 7, Tulane submits that the Compromise Agreement must be reversed because the DEQ's approval of the agreement was arbitrary and capricious. Specifically, Tulane first argues that the Compromise Agreement has not avoided adverse environmental impacts to the maximum extent possible. Second, Tulane argues that the environmental impact costs outweigh any social and economic benefits presented by the Compromise Agreement. Third, Tulane argues that the DEQ failed to consider alternative projects that offer more environmental protection without unduly curtailing non-environmental benefits.
La. Const. art. IX, Section 1, provides, in full, as follows:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
As the supreme court recognizes, the environment is held in trust for the people of this state. Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1154 (La.1984). Hence, the supreme court recognizes that the "public trust doctrine" is an attribute preserved by the 1974 Louisiana Constitution. Id. at 1154. Moreover, in fulfilling its constitutionally mandated duty, the legislature has enacted the Louisiana Environmental Quality Act, establishing the DEQ as the trustee of the environment. See La.R.S. 30:2001 et seq.
In Save Ourselves, the supreme court realized that "[e]nvironmental amenities will often be in conflict with economic and social considerations." 452 So.2d at 1157. With this in mind, the supreme court provides that "the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors." Id. at 1157. Hence, before granting approval of proposed action affecting the environment, the DEQ is required "to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare." Id. at 1157. Accordingly, "a rule of reasonableness" comports with the legislative aim and constitutional standard warranting protection of the environment. Id. at 1157.
In light of the standard of judicial review pertaining to the substantive aspects of an agency's decision, the supreme court stipulates that the reviewing court "encounters significant limitations." Id. at 1159. Furthermore, the supreme court provides that "[i]t is elementary that a court's function is not to weigh de novo the available evidence and to substitute its judgment for that of the agency." Id. at 1159. Following the guidance of the supreme court, this court stated that "if the evidence as reasonably interpreted supports the determination of an administrative agency, its orders are accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious." Blackett v. Louisiana Department of Environmental Quality, 506 So.2d 749, 752 (La.App. 1st Cir.1987). Hence, the test for determining whether the action is arbitrary and capricious is "whether the action taken is reasonable under the circumstances." Castle *700 Investors, Inc. v. Jefferson Parish Council, 472 So.2d 152, 154 (La.App. 5th Cir.), writ denied, 474 So.2d 1311 (La.1985). Stated differently, the question is whether the action taken was without reason. Id. at 154.
Our review of the record reveals that the DEQ reviewed the technical aspects of the Closure Plan contained in the Compromise Agreement. A letter from James Brent, Ph.D., to Deputy Secretary Bill Kucharski discloses that not only did the DEQ review the settlement plan proposed by the City of New Orleans and Recovery, but the DEQ revised the plan. The letter discloses that by February 4, 1992, all technical details of the settlement were resolved. Furthermore, our review of the record reveals that a technical assessment of the Recovery I waste site was prepared by Golder Associates, Inc., a group of consulting engineers. The assessment, dated November 18, 1991, is referred to as the "Golder Report."
The Golder Report assesses the closure impact of Recovery I. A survey of Recovery I revealed that the landfill is only partially full. To confect a proper closure of Recovery I, the Golder Report indicates that the landfill cover should consist of three feet of compact clay topped with six inches of topsoil. The Golder Report emphasizes that the addition of a clay cover presents a higher degree of safety than allowing the landfill to remain uncovered. Further, the Golder Report provides that a staged construction method for the final cover is strongly advised. Hence, the Golder Report cautions that the final cover should be constructed in a staged manner to prevent the cover from cracking. Moreover, the Golder Report provides that a staged construction of the final cover coupled with monitoring will significantly reduce the chance of failure.
Our review of the record reflects that the Closure Plan contained in the Compromise Agreement is consistent with the recommendations stipulated in the Golder Report. The Closure Plan requires a final cover composed of three feet of clay topped with six inches of topsoil. Further, the topsoil is to be fertilized and vegetated to prevent erosion. Also, the Closure Plan provides that the final cover shall be constructed in phases. Hence, the cover will be constructed in a staged manner. Additionally, the Closure Plan provides that the City of New Orleans will be responsible for the post-closure care and monitoring of Recovery I. The post-closure plans indicate that the City of New Orleans will convert the closed facility into an observation area overlooking the neighboring wildlife refuge. The United States Fish and Wildlife Service has approved this plan. Also, Recovery will assist in the construction of an observation tower.
Finally, our review of the record reveals that the DEQ considered alternatives. Apparently, the DEQ considered forcing a closure of Recovery I, evidenced by the April 12, 1990 Compliance Order. Furthermore, the DEQ considered various lengths of time for the continued operation of Recovery I. Accordingly, the record discloses that the DEQ entertained a two to four year operational time frame.
After a thorough review of the record, we find that the concerns Tulane raises were adequately addressed by the DEQ before approving the Compromise Agreement. First, the Compromise Agreement has avoided adverse environmental impacts to the maximum extent possible because the Closure Plan adopts the closure recommendations stipulated in the Golder Report. Second, the social and economic advantages presented by the Compromise Agreement appear to be great because the City of New Orleans will have an additional waste site and Recovery will shoulder the costs of closing Recovery I. Moreover, we find that the environmental benefits are great because, as stated in the Golder Report, a final cover is safer than no cover at all. Hence, there appears to be a symbiotic relationship between the environment and the economy in that the reopening of the facility will generate the funds to close the facility in an environmentally sound manner. Third, the DEQ considered alternatives, evidenced by the Compliance Order, which focused on a permanent closure, and the DEQ correspondence that reflects the agency entertained operational time frames other than three years.
*701 Accordingly, we fail to find any evidence in the record that indicates that the DEQ's approval of the Compromise Agreement can be characterized as arbitrary and capricious. Thus, we cannot say that the DEQ acted without reason. Instead, we find that the DEQ's approval of the Compromise Agreement was rationally related to the public's interest in properly closing the Recovery I landfill.
Therefore, Tulane's assignments of error relating to the substantive aspects the Compromise Agreement are without merit.

DECREE
For the above stated reasons, the settlement agreement appealed from is affirmed. Tulane is taxed with all costs.
AFFIRMED.
CRAIN, Judge, concurs.
I concur with the result reached in this case upholding the Compromise Agreement. I have serious reservations as to the standing of numerous appellants. Under La.R.S. 30:2024C, "[a]ny person aggrieved by a final decision or order of the secretary may appeal therefrom to the Court of Appeal First Circuit...." "To be aggrieved within the context of LSA-R.S. 30:1072C. a party must have a real and actual interest which is or may be adversely affected by the DEQ's decision." MATTER OF BASF CORP., CHEMICAL DIVISION, 533 So.2d 971, 973 (La.App. 1st Cir.1988). The problem is how to determine whether the appealing parties have a real and actual interest except through vague allegations. In BASF, the appeal was taken by parties not involved in the administrative process. Here, the appeal is taken by parties whose alleged interest is asserted for the first time by taking an appeal. This court is not in a position to take evidence to determine interest. In these cases that issue is not being determined through the winnowing process of exceptions and hearings relevant thereto that would occur in a trial court in ordinary proceedings.
In this case there are some parties before us who are undoubtedly affected by the decisions made. Consequently, there is no real urgency to the standing question. However, it can be anticipated that surely the time will come when those really impacted will have a totally different position from those who have no real interest aside from asserting a position.
The statute should probably be amended to establish a means of determining real and actual interest prior to appeal. Lacking those means, I would recommend remanding with specific instructions for making that determination.
NOTES
[1] Fifteen civic and environmental organizations are represented by Tulane. The organizations are the Vietnamese-American Voters Association, Village De L'Est Homeowner's Association, Louisiana Environmental Action Network, Southern Christian Leadership Conference, St. Bernard Citizens for Environmental Quality, Association of Community Organizations for Reform Now, Gulf Coast Tenants Organization, St. Bernard Sportsmen's League, Women for a Better Louisiana, Friends of the Lake, Orleans Audubon Society, League of Women Voters of New Orleans, Delta Greens, Versailles Arms Residents Advisory Council, and Citizen Action of Louisiana. These organizations are the appellants in this matter. However, these organizations will be referred to singly as "Tulane."
[2] The "Compromise Agreement" between the DEQ, the City of New Orleans, and Recovery incorporates the "Settlement Agreement" between the City of New Orleans and Recovery and the "Closure Plan" for the Recovery I landfill. Interestingly, although Paul Templet, the former Secretary of the DEQ, negotiated the Compromise Agreement on behalf of the DEQ, Kai Midboe, the present Secretary of the DEQ, signed the agreement on June 5, 1992. Thus, the Compromise Agreement had the approval of two DEQ administrations.
[3] In full, La.R.S. 30:2024(C) provides as follows:

Any person aggrieved by a final decision or order of the secretary may appeal therefrom to the Court of Appeal, First Circuit, if a motion for an appeal is filed with the secretary within thirty days after the final decision or order is served upon the respondent. Any preliminary, procedural, or intermediate ruling or decision by the secretary is subject to the supervisory jurisdiction of the appellate court as provided by Article V, Section 10 of the Constitution of Louisiana. The Court of Appeal, First Circuit, shall promulgate rules of procedure to be followed in taking and lodging such appeals. The provision of R.S. 49:962 and 964 shall not apply to decisions and orders of the secretary.
[4] As amended by Acts 1992, No. 965, § 1, La. R.S. 30:2025(H) currently provides, in full, as follows:

Except as otherwise provided herein, the secretary, with the concurrence of the attorney general, may settle or resolve as deemed advantageous to the state any suits, disputes, or claims for any penalty under any provision of this Subtitle or the regulations or permit or license terms and conditions applicable thereto. If the attorney general fails to take action within ninety days after the receipt of any settlement submitted for concurrence, the secretary may execute the settlement without the concurrence of the attorney general. For the purposes of this Subsection, the term "take action" means to concur, to refuse to concur, or to request additional information necessary to evaluate the terms and conditions of the settlement.
Furthermore, although Acts 1992, No. 965, § 2 stipulates that "[t]he provisions of this Act shall have prospective application only and shall not be applied retroactively," it is noteworthy to convey that the change in the law would not have affected this matter otherwise.