984 So.2d 760 (2008)
WOMEN'S AND CHILDREN'S HOSPITAL
v.
STATE of Louisiana, DEPARTMENT OF HEALTH AND HOSPITALS.
No. 2007 CA 1157.
Court of Appeal of Louisiana, First Circuit.
February 8, 2008.
Rehearing Denied April 3, 2008.
Writ Granted June 27, 2008.
*762 Matthew K. Brown, James P. Kovata, New Orleans, LA, for Plaintiff-Appellant, Women's and Children's Hospital.
Neal R. Elliott, Jr., Baton Rouge, LA, for Defendant-Appellee, La. Dept. of Health and Hospitals.
Before CARTER, C.J., PETTIGREW and WELCH, JJ.
WELCH, J.
Plaintiff, Women's and Children's Hospital ("WCH") appeals the district court's judgment denying WCH's petition for judicial review of an administrative adjudication upon finding that the Medicaid reimbursement rate-setting methodology used by defendant, Department of Health and Hospitals ("DHH"), to determine the Medicaid per diem reimbursement rate for the hospital's neonatal intensive care unit ("NICU"), was in accordance with applicable policy, correct and should be upheld. We reverse and remand.

MEDICAID RATE-SETTING METHODOLOGY BACKGROUND
In 1994, DHH promulgated a rule (the "1994 Rule") establishing a new methodology that the agency would use to calculate Medicaid reimbursement payments for hospitals, specialty facilities, and certain hospital units (collectively referred to as "hospitals/units"). According to the 1994 Rule, "Medicaid reimbursement for inpatient hospital services . . . will be made according to prospective per diem rates for various peer groups of hospitals/units." In general, the new rate-setting methodology: (1) classified hospitals/units into separate peer groups based on criteria provided in the 1994 Rule;[1] (2) established that the peer group per diem rate would be composed of four specific costs components  "Operating costs," "Movable equipment costs," "Fixed capital costs," and "Medical education costs;" and (3) provided the method for calculating the peer group rate for each component part.
In addition to establishing the peer group per diem rates for each cost component, the 1994 Rule provided that hospitals/units would be reimbursed at a "blended rate of the established peer group rate and a portion of the . . . hospital-specific *763 cost per diem for operating, capital (movable and fixed), education and specialty units per diem costs." For hospitals/units with costs "above the group's weighted median for operations," the 1994 Rule established different blends for each of the three years in the transition period. For hospitals with operating cost below the group's weighted median, the 1994 Rule provided that these hospitals/units "will receive their cost plus 25 percent of the difference between their costs and the peer group rate during the phase-in period of three years." Thus, according to the 1994 Rule, DHH reimbursed a hospital/unit with above median operating costs a per diem rate that was higher than the hospital's/unit's established peer group rates and reimbursed a hospital/unit with below median operating costs a per diem rate that was lower than the established peer group rates.
At the center of the instant controversy is the language in the 1994 Rule regarding an initial three-year transition period or phase-in period. The rule reads: "[i]nitially all facilities within each peer group will be reimbursed at a blended rate for operating costs and movable equipment expenses. The purpose of the blended rate is to provide a phase-in period (3 years) culminating in a statewide flat peer group rate." The 1994 Rule also includes other references to a three-year transition period in its rate-setting section.
The record establishes that before the three-year period elapsed, DHH adopted two additional rules, an emergency rule and a subsequent final rule, regarding the prospective per diem payment methodology (the "Emergency Rule" and the "1996 Rule"). In essence, the Emergency Rule and the 1996 Rule provided that hospitals/units with costs above the peer group rates would be the reimbursed the peer group rates.[2] The parties agree that the Emergency Rule and 1996 Rule only affected hospitals/units with costs above the peer group rates and did not address the rate-setting methodology for hospitals/units with costs below the peer group rates. However, the parties differ as to whether the 1994 Rule provides the post-transition period rate-setting methodology for hospitals/units with costs below the peer group rates.
WCH takes the position that the 1994 Rule provides that hospitals/units are to be reimbursed at the peer group rate after the transition period. DHH takes the position that the 1994 Rule does not establish the rate-setting methodology to be used at the end of the transition period. Asserting that there is no rule that establishes the reimbursement rate for hospitals with below median costs after the transition period, DHH contends that it must apply the rate-setting methodology found in the State's federal Medicaid plan (the "State Plan").[3]
*764 The record contains a copy of an attachment to the State Plan that sets out the State Plan's Medicaid rate-setting methodology (the "State Plan Amendment"). In general, the State Plan Amendment provides that for dates of service on or after July 1, 1994, "Medicaid reimbursement for inpatient hospital services . . . will be made according to prospective per diem rates for various peer groups of hospitals/units." The record shows that the State Plan Amendment was approved by the federal agency, Center for Medicare and Medicaid Studies (formerly called the Health Care Financing Administration) in 1999. The record does not contain a copy of the State Plan's rate-setting methodology that was approved prior to 1999. However, the testimony of current DHH employee, Debbie Gough, establishes that the State Plan's 1999 provision regarding hospitals with costs below the peer group rate was also included in the earlier version.
Like the 1994 Rule, the rate-setting methodology in the State Plan Amendment establishes peer group per diem rates according to four cost components, "Fixed capital cost," "Medical education cost," "Movable equipment cost," and "Operating cost," and it provides the methods for calculating the peer group per diem rates for each component cost. To calculate the "Operating cost" for hospitals/units with below median costs, the plan provides that "hospitals that had allowable operating cost per day less than the peer group component amount in the base year receive hospital-specific cost per day plus twenty-five percent (25%) of the difference between hospital-specific cost per day and the peer group rate."
To calculate the payment rates for "hospitals with cost per day above the peer group's weighted median for operations for years subsequent to the 3-year transition period" and "hospitals with cost per day equal to or less than the peer group weighted median for operations," the State Plan Amendment provides that "[r]ates are calculated annually by adding together the four components."

WCH'S NICU RATE HISTORY AND PROCEDURAL HISTORY
Effective May 1, 1999, DHH granted WCH's request for Level-3 Regional status of its NICU. DHH notified WCH of its new per diem reimbursement rate. Contending that DHH did not follow the rate-setting methodology set out in its 1994 Rule and that WCH was entitled to the published per diem peer group rate for NICU Level-3 Regional services, WCH attempted to appeal the rate notice. However, DHH notified WCH that its appeal was not timely and the agency would not consider the appeal.
On March 8, 2000, DHH sent WCH a notice that effective March 8, 2000, all per diem rates would be reduced by seven percent until the end of Louisiana's fiscal year, June 30, 2000. In response, WCH attempted again to appeal its reimbursement rate. However, DHH notified WCH that notice of the one-time reduction could not be used as a basis for filing a request for administrative review.
On June 27, 2001, DHH notified WCH of the rate change that is the subject of this appeal. WCH timely filed a "Request for Administrative Review" of the June 27, 2001 rate notice. WCH specifically limited its appeal to its claim that the rate DHH provided in the rate notice was not the per diem rate for NICU Level-3 Regional services as established and required by DHH's own 1994 Rule. On January 31, 2002, DHH denied WCH's request for a rate increase. On February 28, 2002, WCH filed an administrative appeal.
On March 18, 2004, the administrative law judge conducted a hearing on WCH's *765 administrative appeal. On April 30, 2004, the administrative law judge issued a recommended decision. The administrative law judge found that: (1) the 1994 Rule did not provide the rate-setting methodology to be used after the transition period; (2) the 1996 Rule did not establish the rate-setting methodology for hospitals with costs below the peer group rate; and (3) as there were no rules providing the rate-setting methodology for hospitals with cost below the peer group rate, the State Plan must apply. Accordingly, the administrative law judge found that DHH's application of its rate-setting methodology was correct and should be upheld and decided against WCH, stating "DHH'S decision not to increase [WCH'S] rate of reimbursement should be upheld."
On June 8, 2004, WCH filed a "PETITION FOR JUDICIAL REVIEW OF ADMINISTRATIVE ADJUDICATION" with the district court. On February 26, 2007, the district court heard the matter and denied WCH's petition. On April 9, 2007, the district court signed a judgment affirming the decision of the administrative law judge. Subsequently, WCH filed the instant appeal.

ASSIGNMENT OF ERROR
WCH contends that the district court erred in allowing DHH to deviate from its own published rules and by allowing DHH to apply the rate-setting methodology in the State Plan, which it asserts contradicts the 1994 Rule providing for reimbursement at the peer group rate.

STANDARD OF REVIEW
The Louisiana Administrative Procedure Act provides for judicial review over administrative adjudications. Carpenter v. State, Department of Health and Hospitals, XXXX-XXXX, p. 4 (La.App. 1 Cir. 9/20/06), 944 So.2d 604, 607, writ denied, 2006-2804 (La.1/26/07), 948 So.2d 174. In pertinent part, La. R.S. 49:964(A) states, "a person who is aggrieved by a final decision or order in an adjudication proceeding is entitled to judicial review." Louisiana Revised Statute 49:964(B) provides that "[p]roceedings for review may be instituted by filing a petition in the district court of the parish in which the agency is located." The Louisiana Procedure Act specifies that judicial review shall be conducted by the court without a jury and shall be confined to the record. La. R.S. 49:964(F). As to the judicial review of an agency's final decision by the reviewing court, La. R.S. 49:964(G) states:
The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given *766 to the agency's determination of credibility issues.
Pursuant to La. R.S. 49:965, "[a]n aggrieved party may obtain a review of any final judgment of the district court by appeal to the appropriate circuit court of appeal." When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. Oakville Community Action Group v. Louisiana Department of Environmental Quality, XXXX-XXXX, XXXX-XXXX, p. 15 (La.App. 1st Cir.5/5/06), 935 So.2d 175, 183.
The trial court applies the manifest error standard of review in reviewing the facts as found by the administrative tribunal; the trial court applies the arbitrary and capricious test in reviewing the administrative tribunal's conclusions and its exercise of discretion. Samuels v. Goodwin, 2005-2131, p. 4 (La.App. 1st Cir.11/3/06), 950 So.2d 736, 738. A reviewing court should afford considerable weight to an administrative agency's construction and interpretation of its rules and regulations adopted under a statutory scheme that the agency is entrusted to administer, and its construction and interpretation should control unless they are found to be arbitrary, capricious, or manifestly contrary to its rules and regulations. Delahoussaye v. Board of Supervisors of Community and Technical Colleges, XXXX-XXXX, p. 5 (La.App. 1st Cir.3/24/05), 906 So.2d 646, 649 (citing, Matter of Recovery I, Inc., 93-0441 (La.App. 1st Cir.4/8/94), 635 So.2d 690, 696, writ denied, 94-1232 (La.7/1/94), 639 So.2d 1169. An interpretation used by the state administrative agency may be persuasive, but inconsistent interpretation of the overall scheme or use of the wrong rule cannot stand. Varner v. Day, 2000-2104, p. 6 (La.App. 1st Cir.12/28/01), 806 So.2d 121, 125. If the evidence, as reasonably interpreted, supports the determination of an administrative agency, its orders are accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious. Recovery I, 635 So.2d at 699 (citing Blackett v. Louisiana Department of Environmental Quality, 506 So.2d 749, 752 (La.App. 1st Cir.1987)). Hence, the test for determining whether the action is arbitrary and capricious is whether the action taken is reasonable under the circumstances. Recovery I, 635 So.2d at 699-700 (citing Castle Investors, Inc. v. Jefferson Parish Council, 472 So.2d 152, 154 (La.App. 5th Cir.), writ denied, 474 So.2d 1311 (La.1985)). Stated differently, the question is whether the action taken was without reason. Recovery I, 635 So.2d at 700.
On legal issues, however, the reviewing court gives no special weight to the findings of the administrative tribunal, but conducts a de novo review of questions of law and renders judgment on the record. Schackai v. Louisiana Board of Massage Therapy, 99-1957, 99-1958, pp. 9-10 (La.App. 1st Cir.9/22/00), 767 So.2d 955, 960, writ denied, 2000-2898 (La.12/8/00), 776 So.2d 464. The court is free to make its own determination of the correct legal meaning of the appropriate statutes and render judgment on the record. Twin B. Casinos, Inc. v. State, Louisiana Gaming Control Board, XXXX-XXXX, p. 7 (La.App. 1st Cir.9/28/01), 809 So.2d 995, 999. It is well established that in the context of judicial review over administrative action or adjudication, a court of appeal owes no deference to either the factual findings or legal conclusions of the district court, just as the Louisiana Supreme Court owes no deference to the factual findings or legal conclusions of the state's courts of appeal. Carpenter, XXXX-XXXX at p. 6, 944 So.2d at 608.

*767 DISCUSSION
As a preliminary matter, we note that this appeal only addresses WCH's Medicaid reimbursement payment dispute for the dates of service covered by DHH's June 27, 2001 rate notification letter.[4]
Through its assignment of error, WCH submits that DHH violated its own published rule by applying the State Plan's rate-setting methodology instead of the methodology provided in the 1994 Rule. Specifically, WCH construes the 1994 Rule as establishing the post-transition period reimbursement rate as the hospitals'/units' appropriate peer group rates. WCH maintains that the State Plan's methodology clearly conflicts with the 1994 Rule, as the State Plan Amendment provides that hospitals/units with operating costs below the peer group rates are reimbursed at a rate that is less than the peer group rates. WCH contends that DHH's failure to apply its own 1994 Rule resulted in WCH receiving significantly lower Medicaid reimbursement payments, allegedly over four million dollars, than the amount WCH was entitled to receive under the peer group rate established in the 1994 Rule. Further, WCH maintains that the State Plan is not a promulgated rule; and, by applying it to determine WCH's NICU reimbursement rate, DHH violated the Louisiana Administrative Procedure Act.
Conversely, DHH and the administrative law judge interpreted the 1994 Rule as not providing the post-transition period reimbursement rate for hospitals/units, and determined that the 1996 Rule only establishes the reimbursement rates for hospitals/units with actual costs above the peer group rate. Concluding that there were no promulgated rules that applied to hospitals/units situated like WCH, the administrative law judge and DHH concluded that the State Plan's rate-setting methodology must be applied.
DOES THE 1994 RULE PROVIDE THE MEDICAID RATE-SETTING METHODOLOGY FOR THE POST-TRANSITION PERIOD?
We begin our analysis by determining whether WCH's contention that the agency's determination that the 1994 Rule only implements the rate-setting methodology for the three-year transition period contradicts the clear language of the rule. The evidence presented at the administrative hearing includes the 1994 Rule, the Emergency Rule, the 1996 Rule, the State Plan Amendment, testimony of current DHH employee Debbie Gough, and the affidavit of former DHH employee, Linda Welch, submitted by WCH. The record reveals that based on a review and interpretation of the language in the 1994 Rule and the 1996 Rule, the administrative law judge concluded that there were no rules establishing the rate-setting methodology after the transition period for hospitals with costs less than the peer group rate.
In reaching this conclusion, the administrative law judge found that each rule "speaks for itself." As to the 1994 Rule, the administrative law judge concluded that it provides "that hospitals with cost less than the peer group rate will be reimbursed their actual costs plus 25% of the difference between their costs and the peer group rate," "provides for a three-year transition period to a new reimbursement methodology," but "does not specifically state the reimbursement *768 methodology to be applied after the three-year transition period." In analyzing the 1996 Rule, the administrative law judge concluded that the "[a]lthough the 1996 Rule does specifically state the rate-setting methodology to be applied for those hospitals with particular units covered by the peer group rate with costs above the peer group rate, . . . the 1996 Rule does not apply to those hospitals or particular units of hospitals covered by the peer group rate with costs less than weighted median of the peer group." (Emphasis original.) While the administrative law judge stated that WCH "has a valid argument that the 1994 Rule may have been intended to provide a uniform rate subsequent to the end of the three-year transition period," she concluded, "that rule simply does not do that."
Our review of the 1996 Rule shows that the rule contains specific language stating that the agency "will no longer reimburse acute hospitals for inpatient services above the peer group weighted median per diem rate." Also, the 1996 Rule specifically provides the "Medicaid per diem rates for . . . hospitals with per diem rates above the peer group weighted average per diem rate will be reimbursed at the peer group weighted average per diem rate." Accordingly, we find that the agency's conclusion that the 1996 Rule does not establish the reimbursement rate for hospitals with costs below the peer group rate is neither arbitrary or capricious, nor manifestly contrary to its rules and regulations. See Delahoussaye, XXXX-XXXX at p. 5, 906 So.2d at 649.
In considering WCH's argument that the 1994 Rule clearly establishes the post-transition period reimbursement rate, our review of the 1994 Rule reveals that it clearly establishes: (1) that effective July 1, 1994, Medicaid reimbursement "will be made according to prospective per diem rates for various peer groups of hospitals/units;" (2) the four components that "shall" comprise "[e]ach peer group's per diem rate;" (3) the methods for determining the per diem payment rates for each of the four component costs; and (4) the specific formulae for calculating each facilities' individual Medicaid reimbursement rates during the phase-in period.
However, our review also reveals that the 1994 Rule contains language regarding the purpose of using a blended rate methodology during the phase-in period that WCH relies upon to support its interpretation of the rule. In that regard, the 1994 Rule states, (1) "[i]nitially all facilities within each peer group will be reimbursed at a blended rate for operating costs and movable equipment expenses;" and (2) "[t]he purpose of the blended rate is to provide a phase-in period (3 years) culminating in a statewide flat peer group rate;" and "[b]lended rates will be established to phase in over a three year transition period to minimize the impact from changing reimbursement methodology." Also, we note that the 1994 Rule references a phase-in period in its provision that establishes the reimbursement rates for both groups of hospitals.
The statutory and jurisprudential rules for statutory construction and interpretation apply equally well to ordinances, rules, and regulations, Samuels, 2005-2131 at p. 5, 950 So.2d at 739. When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. C.C. art. 10. When the words of a law are ambiguous, the meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. art. 12. An agency is entitled to deference regarding its interpretation and construction of the rules and regulations that it *769 promulgates. See Recovery I, 635 So.2d at 696. Where the legislature has authorized an agency to promulgate rules and regulations, such is analogous to the situation where Congress has explicitly left a void for a federal agency to fill. Id. Accordingly, the agency's interpretations should stand unless they are arbitrary, capricious or manifestly contrary to its rules and regulations. Id.
While the 1994 Rule clearly establishes the rate-setting methodology to be used for all hospitals/units during the transition period, we find that the language WCH relies upon does not clearly establish the peer group rate as the reimbursement rate at the end of the three-year phase-in period. Further, the 1994 Rule provides that DHH implemented blended rates during the phase-in period in order to minimize the impact of the new reimbursement system. Implicit in this language is the potential for hospitals/units to receive less reimbursement under this new methodology than they received under the prior system. When read in context with the provisions establishing the transition period reimbursement rates, it is apparent that only hospitals/units with actual costs above the peer group rates will receive reimbursement payments that are less than their actual costs. Thus, only those hospitals/units will have an impact to minimize.
In contrast, under the new reimbursement system, hospitals/units that have actual costs that are less than the peer group rate will receive their actual costs plus an additional twenty-five percent of the difference of their actual cost and the peer group rate. Thus, the 1994 Rule's blended rate formula did not negatively impact hospitals/units with costs below the peer group rate.
Arguably, the 1994 Rule is ambiguous as it contains some language that can be interpreted in a manner suggested by WCH. However, the record shows there is substantial evidence to support DHH's interpretation, DHH's interpretation is not contrary to the evidence, and the agency's action was not characterized by an abuse of discretion. Thus, given the deference a reviewing court should afford an administrative agency's construction and interpretation of its rules and regulations, and a lack of evidence in the record showing that the agency's interpretation is not sustainable by a preponderance of the evidence or that it is arbitrary, capricious or a clearly unwarranted exercise of discretion, we agree with that part of the administrative decision concluding that the 1994 Rule does not specifically establish the post-transition period prospective payment per diem reimbursement rate.
DID DHH'S APPLICATION OF THE RATE-SETTING METHODOLOGY IN THE STATE PLAN VIOLATE THE RULEMAKING PROVISIONS OF THE LOUISIANA ADMINISTRATIVE PROCEDURE ACT ("LAPA")?
WCH contends that DHH violated LAPA by using the rate-setting methodology in the State Plan that is not a promulgated rule, in order to determine WCH's prospective payment per diem reimbursement rate.
Louisiana Revised Statute 49:953, which sets the procedure for the adoption of rules, requires an agency to publish notice of its intent to adopt, amend, or repeal any rule in the Louisiana Register. Liberty Mutual Insurance Company v. Louisiana Insurance Rating Commission, 96-0793, p. 5 (La.App. 1st Cir.2/14/97), 696 So.2d 1021, 1025, writs denied, 97-2062, 97-2069 (La.12/19/97), 706 So.2d 452, 451. The agency must provide interested persons with copies of the intended rule, and it must offer them a reasonable opportunity to respond. Liberty, 96-0793 at p. 8, 696 So.2d at 1025. No rule shall be effective, *770 nor may it be enforced, unless it was adopted in substantial compliance with the provisions of the LAPA. La. R.S. 49:954(A); Liberty, 96-0793 at p. 8, 696 So.2d at 1025. Further, no rule shall be effective or enforceable unless: (1) it was properly filed with the State Register, (2) a report on the rule was submitted to the legislature in accordance with La. R.S. 49:968, and (3) the approved economic and fiscal impact statements required by La. R.S. 49:953(A) were filed with the Department of the State Register and published in the Louisiana Register. Id.
An administrative rule adopted in accordance with the requirements of the LAPA generally becomes effective upon its publication in the Louisiana Register. La. R.S. 49:954(B). Unfortunately, many State agencies routinely ignore these provisions of law. Liberty, 96-0793 at p. 8, 696 So.2d at 1025. The primary purpose of the procedure set forth in the section for rulemaking is to ensure that all interested parties are made aware of or have notice of any proposed rule which may be adopted. Dorignac v. Louisiana State Racing Commission, 436 So.2d 667, 669 (La.App. 4th Cir.1983).
Louisiana Revised Statute 49:951(6), defines a "rule" as follows:
"Rule" means each agency statement, guide, or requirement for conduct or action, exclusive of those regulating only the internal management of the agency and those purporting to adopt, increase, or decrease any fees imposed on the affairs, actions, or persons regulated by the agency, which has general applicability and the effect of implementing or interpreting substantive law or policy, or which prescribes the procedure or practice requirements of the agency. "Rule" includes, but is not limited to, any provision for fines, prices or penalties, the attainment or loss of preferential status, and the criteria or qualifications for licensure or certification by an agency. A rule may be of general applicability even though it may not apply to the entire state, provided its form is general and it is capable of being applied to every member of an identifiable class. The term includes the amendment or repeal of an existing rule but does not include declaratory rulings or orders or any fees.
This court has not previously determined whether the Medicaid reimbursement rate-setting methodology in the State Plan is a "rule" as defined by the LAPA. However, in Liberty, another panel of this court concluded that a Louisiana Insurance Rating Commission ("LIRC") bulletin constituted a "rule" under the LAPA. This court found that LIRC's bulletin required that insurers submit wrap-up programs for approval and set forth three criteria which must be considered in the filing of any insurer submitting a plan to LIRC for approval. Liberty, 96-0793 at p. 8, 696 So.2d at 1026. This court found that each of the criterion provided some type of limitation on the use of wrap-up programs in the insurance industry. Id. Accordingly, this court found that the bulletin's "pronouncements" did not merely serve an "investigative" or "interpretive" "function without substantive effect" and concluded that the bulletin was a "rule" under the LAPA. Liberty, 96-0793 at p. 8, 696 So.2d at 1026-1027.
In Star Enterprise v. State, Department of Revenue and Taxation, 95-1980, 95-1981, 95-1982, p. 10 (La.App. 1st Cir.6/28/96), 676 So.2d 827, 832, writ denied, 96-1983 (La.3/14/97), 689 So.2d 1383, this court found that a letter sent by the Department of Revenue and Taxation (the "Department") to all Louisiana oil refineries establishing a new method of computing the value of refinery gas and coke-on-catalyst *771 clearly constituted a "rule" under the LAPA. The new valuation method in the letter was different from the valuation method set out in the statute, the Department's prior adopted rule, and in the proposed rule the Department attached to a Notice of Intent. Star Enterprise, 95-1980 at p. 5, 676 So.2d at 830. In addition to providing a new valuation method, the letter directed the oil refineries to "disregard any and all previous regulations, correspondence or other communications from the Department . . . with respect to taxation of refinery gas and coke-on-catalyst." Id. Accordingly, the letter constituted a "rule." Star Enterprise, 95-1980 at p. 10, 676 So.2d at 832.
While these prior cases are factually distinguishable from the instant matter, the analysis used to determine whether the LIRC bulletin and the Department's letter constituted a "rule" is applicable to the instant case. In the instant matter, the record establishes that DHH applied the rate-setting methodology to calculate the specific reimbursement rates for all applicable hospitals/units. Thus, the rate-setting methodology is not merely interpretive as it has the substantive effect of establishing the rights and obligations of the parties regarding Medicaid reimbursement payments. Accordingly, we find that the rate-setting methodology in the State Plan Amendment is a "rule" under the LAPA as it is a "statement, guide, or requirement for conduct or action" and it does not regulate only the internal management of the agency or merely interpret substantive law or policy. See La. R.S. 49:951(6).
Implicit in DHH's argument is that DHH did not follow or substantially comply with the rulemaking requirements in LAPA prior to using the State Plan Amendment to calculate WCH's NICU Medicaid reimbursement rate. As previously noted, a "rule" is not valid unless it is adopted in substantial compliance with the provisions of the LAPA. See, La. R.S. 49:954(A). Therefore, we find that the rate-setting methodology relied upon by DHH in this matter is an invalid rule and unenforceable. See Star Enterprise, 95-1980 at p. 10, 676 So.2d at 832.
Having determined that DHH's application of an invalid rule violates the LAPA, we must determine what rate-setting methodology can be applied in this matter.
There is no dispute that the 1994 Rule was promulgated in accordance with the LAPA. Also, as noted above, the 1996 Rule's rate-setting methodology only applied to hospitals/units with costs above the peer group rate and had no impact on the 1994 Rule's rate-setting methodology for hospitals/units with costs below the peer group rate. While the 1994 Rule does not specifically establish the post-transition rate in this matter, the record shows that DHH did not amend or repeal the 1994 Rule, nor did it adopt another rule that established the Medicaid reimbursement methodology for hospitals/units with costs below the peer group rate. As the 1994 Rule's rate-setting methodology relevant to WCH was not amended, repealed, or replaced by a valid rule, we must determine if the 1994 Rule can be applied in this matter.
While this particular issue is a matter of first impression to this court, the Louisiana Supreme Court discussed this concern in its decision in Louisiana Consumers' League, Inc. v. Louisiana Public Service Commission, 351 So.2d 128 (La.1977). In Consumers' League, a consumer group ("the League") filed a petition, in the fall of 1976, to intervene in a rate increase application proceeding before the Louisiana Public Service Commission (the "Commission") pursuant to Rule 10 of the Rules of Practice and Procedure of the Commission. *772 Rule 10 allowed civic organizations to intervene in the proceeding and was effective November 16, 1972. Consumers' League, 351 So.2d at 130. However, the Commission denied the League's petition based on a July 1, 1996 amendment to Rule 10. However, the Commission allowed the League to participate in the proceedings as an "interested party" under the amended version of Rule 10. Id. The League filed an appeal contending that the amendment to Rule 10 was ineffective in that it was not adopted in compliance with the rulemaking provisions of the LAPA.
While the Louisiana Supreme Court concluded that the Commission's own rules of procedure applied and not those of the LAPA, the court concluded that any rules, regulations, and procedures, including the method by which a rule is adopted, amended, or repealed, that the Commission adopts must be reasonable. Consumers' League, 351 So.2d at 131-132. The court determined that to be considered reasonable, the procedure by which a rule change is effected must provide for notice of the proposed rule change and a reasonable opportunity for interested persons to submit data or views addressed to that issue. Consumers' League, 351 So.2d at 132. Finding that the Commission failed to afford notice of the proposed amendment, the court concluded that the former version of Rule 10 remained in force. Id., see also Central Louisiana Electric Company Inc. v. Louisiana Public Service Commission, 377 So.2d 1188, 1195 (La. 1979).
We find that the analysis used by the Louisiana Supreme Court is consistent with the purpose of LAPA's rulemaking procedures. In the instant matter, we find that DHH did not properly amend, repeal, or change the 1994 Rule's rate-setting methodology for hospitals/units with costs below the peer group average. Thus, under the particular facts as shown in the record, we conclude that the agency committed legal error in not applying the 1994 Rule's rate-setting methodology for hospitals/units with costs below the peer group rate to determine the Medicaid reimbursement rate for the NICU Level-3 Regional services WCH provided.
Under La. R.S. 49:964(G), a court may remand the case for further proceedings. However, in order to reverse or modify the agency's decision, substantial rights of the appellant must be prejudiced. La. R.S. 49:964(G). We note that the administrative law judge concluded that the rate-setting methodology in the 1994 Rule and the State Plan Amendment both "provide that hospitals with costs less than the peer group rate will be reimbursed their actual costs plus 25% of the difference between their costs and the peer group rate." Thus, it appears that applying the relevant rate-setting methodology in the 1994 Rule would not affect the actual reimbursement payment owed to WCH.
Accordingly, we remand this matter to the State of Louisiana, Department of Health and Hospitals to determine Women's and Children's Hospital's Medicaid reimbursement payment rate for services covered by the June 27, 2001 rate notification letter in accordance with the 1994 Rule. Costs of this appeal in the amount of $2,740.00 are assessed to appellee, State of Louisiana Department of Health and Human Hospitals.
REVERSED IN PART AND REMANDED.
PETTIGREW, J., concurs.
CARTER, J., concurs.
NOTES
[1] The 1994 Rule established four peer groups for NICUs, Level-1, Level-2, Level-3, and Level-3-Regional, with Level-3-Regional units providing the highest level of neonatal care. WCH had a Level-3 Regional status.
[2] The Emergency Rule provided that effective July 1, 1995, DHH "will no longer reimburse acute hospitals for inpatient services above the peer group weighted median per diem rate" and provided that "hospitals with per diem rates above the peer group weighted average per diem rate will be reimbursed at the peer group weighted average per diem rate." Louisiana Register, Vol. 21 No. 7, July 20, 1995, p. 646. The substance of the Emergency Rule was adopted as a final rule in 1996. Louisiana Register, Vol. 22, No. 1, January 20, 1996, p. 32.
[3] In order to receive federal funds for the State's Medicaid Program under Medical Assistance Program of Title XIX of the Social Security Act, Louisiana must submit a plan for developing and implementing its Medicaid program that meets federal requirements. The State Plan must be approved by the federal government. See 42 U.S.C. § 1396a(13)(A); Schweiker v. Gray Panthers, 453 U.S. 34, 36-37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981).
[4] In its administrative appeal, WCH noted that it was in no way compromising the hospital's position regarding its entitlement to the maximum peer group reimbursement for its NICU as of May 1, 1999, which is the date DHH recognized the unit as having NICU Level-3-Regional status and provided WCH with its per diem rate as a NICU Level-3 Regional service provider.