935 So.2d 175 (2006)
OAKVILLE COMMUNITY ACTION GROUP, Louisiana Environmental Action Network, and Glynn Mayfield
v.
LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY
Nancy Fridge and Thomas Rhodes
v.
Louisiana Department of Environmental Quality.
Nos. 2005 CA 1365, 2005 CA 1366.
Court of Appeal of Louisiana, First Circuit.
May 5, 2006.
Adam Babich, Karla A. Raettig, Rebecca G. Judd (Student Attorney), New Orleans, Counsel for Plaintiffs/Appellants Oakville Community Action Group, Louisiana Environmental Action Network and Glynn Mayfield.
Peter J. Butler, New Orleans, Joell Keller, Baton Rouge, Counsel for Plaintiff/Appellant Nancy Fridge and Thomas Rhodes.
Jackie M. Marve, Mazie M. Doomes, Roger K. Ward, Baton Rouge, Counsel for Defendant/Appellee Louisiana Department of Environmental Quality.
Robert B. McNeal, Mark L. McNamara, Stephen O. Scandurro, Timothy D. Scandurro, Jean-Paul Layrisson, New Orleans, Counsel for Intervenor/Appellee Industrial Pipe, Inc.
Before: KUHN, GUIDRY, and PETTIGREW, JJ.
*176 KUHN, J.
This appeal presents the issue of whether the Louisiana Department of Environmental Quality ("LDEQ") properly categorized Industrial Pipe, Inc.'s ("IPI") waste processing facility as a Type III facility, which is subject to a 50-foot buffer zone requirement under Louisiana's Solid Waste Regulations, Louisiana Administrative Code title 33, part VII, § 101 et seq. Plaintiffs-appellants, Oakville Community Action Group, Louisiana Environmental Action Network, and Glynn Mayfield (collectively referred to herein as "the Oakville *177 plaintiffs"), contend that IPI's operations at the facility render it a Type II-A facility, which is subject to a 200-foot buffer zone requirement. The LDEQ issued a Standard Solid Waste Type III permit, number P-0261RI, to IPI for its Separation Facility on January 7, 2004, and reissued the permit on August 25, 2004, with revised conditions. The Oakville plaintiffs challenged LDEQ's actions in a petition for judicial review, and IPI intervened in that proceeding. The district court affirmed LDEQ's actions, and the Oakville plaintiffs have appealed. After our own consideration of LDEQ's administrative record and the district court's record, we likewise affirm the district court's actions.[1]

I. FACTUAL AND PROCEDURAL HISTORY
IPI owns and operates various businesses on land located in Plaquemines Parish at 11266 Highway 23 in Belle Chase, Louisiana. At that address, IPI operates both a Construction/Demolition Debris/Woodwaste Landfill ("C & D Landfill") and a Separation Facility.[2] The Separation Facility is located on approximately two acres of land and is about 2,500 feet west of La. Hwy. 23 and 600 feet south of the Hero Canal. Undeveloped property borders the Separation Facility to its north and south. The community of Oakville is located more than 1,300 feet to the southeast of the facility. In May 1989, IPI completed construction of its Separation Facility with the understanding that no solid waste permit was required.
In October 1989, LDEQ issued a penalty notice to Kennett Stewart, president and owner of IPI, wherein LDEQ found that Stewart had attempted to operate a recycling operation, known as the IPI Transfer Station. LDEQ found the operation was "an unauthorized transfer station," and assessed a fine. LDEQ also issued a compliance order, wherein Stewart was ordered to close the unauthorized facility. Stewart complied with the order, and in August 1990, IPI applied for its initial permit for the facility.
IPI's application described the type of waste being handled as "construction debris and waste paper and paper products (from reclamation project on site). In this waste is a deminumus (sic) amount of lunch wrappers and lunch remains that will be removed and sent to an appropriate facility." The application further described the handling of waste at the facility as follows:
After dumping [the waste] on the tipping floor, wastes will be segregated and wastes routed to the reclamation facility and to the incinerator will also be measured by volume. Remaining wastes which inadvertently was included in the loads and which cannot be handled at this facility will be contained, measured by volume, and shipped to the nearest facility permitted for such wastes.
IPI's application further stated:
The facility will separate, store, and process the following types of materials:

*178  Materials for reclamation (paper and paper products, metals, and glass)
 Materials inadvertently included in loads for reclamation which cannot be handled due to economic or permit restriction reasons. Such materials will be disposed of in the incinerator on the site (if allowed by incinerator permit) or transport to off-site facility permitted for such materials
 Municipal solid wastes.
In August 1991, LDEQ issued IPI a Standard Permit, P-0261, for the operation of the facility, which LDEQ categorized as a transfer station. When LDEQ issued the initial permit, Louisiana Administrative Code title 33, part VII, § 1305(A)(3)(d) addressed the requisite buffer zone:
Buffer zone not less than 200' in width or other acceptable means to protect adjoining landowners against detrimental effects from the operation of the facility, shall be provided between any solid waste operating unit of the facility and the property line. A reduction in this requirement shall be allowed only with the permission of the adjoining landowners and occupants. Buffer zone requirements may be waived or modified by the assistant secretary for areas of landfills which (sic) have been closed in accordance with these regulations and for existing surface impoundments or existing industrial solid waste landfills.
After obtaining the permit, IPI's operations at the Separation Facility resumed. Since then, IPI has maintained more than a 200-foot buffer zone on its east, west, and northern boundaries. It acknowledges, however, that its facility is 95 feet from the southern boundary of its property and that the buffer zone towards the south extends into the neighboring undeveloped property, which it asserts is not subject to development or other use due to lack of access. As part of its initial application to construct and operate the Separation Facility, IPI submitted a signed waiver form from an adjoining property owner, Eckerd Johnson, Sr. This purported waiver acknowledged that "the buffer zone required of two hundred feet from the unit will extend into my property" and further stated, "I have no objection to this proposal."
In 1992, LDEQ received a letter from the Tulane Environmental Law Clinic ("the Law Clinic") claiming that the buffer zone waiver purportedly signed by Mr. Johnson was a forgery.
In 1993, LDEQ issued new solid waste regulations, thereby obtaining the authority of the United States Environmental Protection Agency to regulate solid waste disposal in Louisiana under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA).[3] Pursuant to LDEQ's new regulations, existing solid waste facilities were required to submit new permit applications. Type II-A facilities operating under a standard permit were required to submit a mandatory modification document addressing the new state regulations to LDEQ no later than February 1, 1994. La. Admin. Code tit. 33, part VII, § 315(G)(3)(a).[4]
In February 1994, IPI submitted its mandatory permit modification, which addressed physical and operational modifications made in response to the new regulations. Therein, in reference to the 200-foot *179 buffer zone requirements applicable to Type II-A facilities set forth in Louisiana Administrative Code title 33, part VII, § 717(B)(2)(a), IPI asserted, "A waiver allowing the encroachment of the 200 foot buffer zone onto neighboring property located to the south is still in affect."
In August 1996, the LDEQ issued a notice of intent to revoke IPI's permit and a show cause order based upon the problems with the buffer zone waiver.[5] Pursuant to a September 30, 1996 letter from Peter A. Romanowsky and Ted E. Dove of G & E Engineering, Inc. submitted on IPI's behalf, IPI petitioned LDEQ for an exemption from the 200-foot buffer zone requirement for a Type II-A facility. The letter represented that Mr. Stewart had recently learned that Mr. Johnson had owned only a one-ninth undivided interest in the property to the south of IPI's facility and that "the buffer zone waiver obtained and acted upon in good faith by Mr. Stewart may be considered potentially defective." The letter further stated that compliance with the buffer zone requirement would require the dismantling and demolishing of the current facility and the reconstruction and assembling of the facility 105 feet to the north of the southern boundary of the property, which would cost approximately $750,000. The letter submitted that such an expense was an unreasonable economic burden to impose on IPI.
LDEQ responded by letter dated October 21, 1996, wherein it informed Mr. Stewart that the "waiver signed by `Eckerd Johnson, Sr.' was not . . . valid at the time you applied for a permit for your transfer station." In November 1996, LDEQ granted the Law Clinic's request for a sixty-day comment period and a public hearing concerning IPI's exemption request. In September 1996, LDEQ rescinded its notice of intent to revoke IPI's transfer station permit, while reserving the right to reissue a notice. On May 22, 1997, LDEQ's Solid Waste Division decided to approve IPI's exemption request, based on its findings that: 1) the transfer station was an existing facility; 2) if the exemption were not granted, IPI would be forced to either cease operations or relocate; 3) the adjoining property was mainly wetlands and "may not be suitable for development without mitigation measures;" and 4) the Corps of Engineers was proposing to construct a hurricane protection levee within the buffer zone that would buffer the transfer station from the adjoining property.
In June 1997, however, LDEQ's Assistant Secretary issued a compliance order that directed IPI to provide documentation to the Solid Waste Division of the 200-foot buffer zone in accordance with its Standard Permit, P-0261. But in July 1997, LDEQ's Assistant Secretary issued an amended compliance order deleting the paragraph that had previously ordered compliance with the 200-foot buzzer zone requirement. After LDEQ issued the amended compliance order, IPI considered the matter resolved.
In May 1998, however, the Law Clinic sent a letter to LDEQ, stating that IPI had continued to operate its transfer station in violation of LDEQ regulations and *180 IPI's permit requirements by operating within 200 feet of adjoining property without a valid waiver. The Law Clinic asked LDEQ to: 1) deny IPI's exemption application, and 2) reissue its "Notice of Intent to Revoke Permit" that LDEQ originally issued in August 1996.
In a May 4, 1999 letter from IPI's counsel to LDEQ, IPI formally withdrew its petition for exemption that had been filed in September 1996. Also in a May 5, 1999 letter to LDEQ's Office of Waste Services, IPI formally requested reclassification of its facility from a Type II-A Transfer Station to a Type III Separation Facility. This letter delineated the facility's permit history and stated that LDEQ personnel had initially found that IPI's facility was technically not a transfer station, but they had required IPI to apply for a transfer station permit due to the broad definition of a transfer station under the existing regulations in 1991. Based on the 1993 revisions of Louisiana's Solid Waste Regulations, IPI's counsel urged that LDEQ should have reclassified IPI as a Type III Separation Facility and instructed IPI to submit a mandatory modification document compliant with the requirements applicable to such facilities rather than being required to submit a mandatory modification document to address the solid waste regulations for a Type II-A Transfer Station in accordance with Louisiana Administrative Code title 33, part VII, § 315(G)(3).
Along with IPI's May 1999 letter addressing its facility's categorization, IPI submitted a revised solid waste permit mandatory modification for a Type III Separation Facility. Therein, IPI described that it maintained a "50-foot (plus) buffer zone" around the Separation Facility and indicated that its facility did not store, process, or dispose of solid waste within the buffer zone. See La. Admin. Code tit. 33, part VII, § 719(B)(2).
In June 1999, the Law Clinic again wrote to LDEQ requesting a meeting regarding LDEQ's failure to act regarding IPI's buffer zone violation. In September 1999, LDEQ's Permit Division denied IPI's request for a facility reclassification. In February 2000, IPI's counsel submitted a petition to amend IPI's modification request ("Modification # 3"), wherein IPI sought, among other modifications, to re-categorize only a portion of its facility, the picking belt system, as a Type III Separation Facility. On February 29, 2000, LDEQ approved Modification # 3, allowing the southern portion of the facility to be categorized as a separation facility and the remaining portion as a transfer station. LDEQ's decision was later challenged in the Nineteenth Judicial District Court. In Mayfield v. Givens, 470,993 (19th J.D.C. 12/8/00), the district court vacated LDEQ's decision and remanded the matter to LDEQ.
In July 2001, IPI asked LDEQ to consider its mandatory modification document as an equivalent to a permit renewal request, and IPI published its notice of intent to submit a permit renewal application for a Type II-A/III Transfer and Recycling Facility. In August 2001, IPI submitted a solid waste permit renewal application/mandatory modification document for a Type II-A/III Transfer Station/Separation Facility. The application set forth that the Separation Facility maintains a minimum 50-foot buffer zone and the Transfer Station maintains a minimum 200-foot buffer zone. In May 2003, IPI received LDEQ's notices of deficiencies in response to IPI's May 1999 and August 2001 submittals, and on June 20, 2003, IPI filed its responses to those notices, providing the additional information requested by LDEQ.
*181 In August 2003, IPI submitted its solid waste permit renewal application for a Type III Separation Facility and resubmitted final copies of the renewal application in October 2003. This application identified the Separation Facility as a Type III Resource Recovery/Recycling Facility that was being operated by IPI's subsidiary, Riverside Recycling & Disposal. This application also indicated that the facility processes off-site waste from residential, commercial, and other (curbside debris, white goods, and construction/demolition debris) sources for the purpose of recovering recyclable materials. Exhibits to IPI's application set forth that the Separation Facility maintains a minimum 50-foot buffer zone in accordance with regulations for Type III facilities.
In October 2003, LDEQ reviewed the updated permit application and deemed it technically complete and ready for public review. A public hearing was held, followed by a two-month public comment period that ended in December 2003. On January 8, 2004, LDEQ issued a Standard Type III permit, P-0261 RI, to IPI's Separation Facility. In support of the permit action, LDEQ issued a detailed "Basis for Decision," concluding that the Separation Facility permit would be "protective of human health and the environment." Because LDEQ imposed certain permit conditions that required IPI to weigh all materials entering the facility and restricting its operating hours, IPI filed a request for a hearing with LDEQ's secretary contesting these restrictions.[6]
In February 2004, the Oakville plaintiffs filed a petition for judicial review, naming LDEQ as a defendant, challenging the categorization of IPI's Separation Facility, and seeking to have IPI's Type III standard permit vacated. IPI intervened in these proceedings, praying that the Oakville plaintiffs' requested relief would be denied.
After IPI submitted additional documentation to LDEQ's permit division, IPI and LDEQ entered into a settlement agreement regarding the appealed permit conditions. On August 25, 2004, LDEQ reissued the Type III Separation Facility permit with revised conditions pertaining to the facility's measurement of waste and its operating hours. At this juncture, the Oakville plaintiffs amended their petition, asserting LDEQ's permitting decisions are not supported by the law and seeking to have the Type III Separation Facility permit vacated, both as it was originally issued and as it was amended.
After reviewing LDEQ's administrative record and conducting its own hearing, the district court signed a judgment affirming LDEQ's issuance of the Type III Separation Facility permit on January 7, 2004 and its re-issuance of the permit, with revised conditions, on August 25, 2004. The district court reasoned, in pertinent part:
[LDEQ] is the state agency charged with interpreting its own rules and regulations. And I fully agree with the cases cited by [LDEQ], which says that in interpreting their own rules and regulations great deference must be given to their interpretation. And it is [LDEQ's] position, and one that I think is supported completely by the record, that there was not a change in what [IPI] was doing at this facility; it was just a change in definition or in classification. And [LDEQ] just fit the old function to the new label . . . and, I think, was totally appropriate in its decision to classify this facility now as a Type III facility under the new definitions and classifications. And I do not see that as a basis for reversal or remand.

*182 ...
I have handled ... many appeals from [LDEQ] in the eight years that I've been on the bench. And I must say that this is the most thorough and comprehensive basis for a decision and responsiveness summary that I have seen in those eight years. It covered all aspects of the I.T. analysis. It gave meaningful and appropriate responses to the comments that were generated in the public comment section. I see absolutely no basis for reversal or remand based upon the I.T. analysis that was done. I think the evidence supports the [LDEQ] decision, and I'm going to affirm that decision at [the Oakville plaintiffs'] costs.
The Oakville plaintiffs have appealed, urging that the district court erred in upholding LDEQ's permitting decisions. They contend LDEQ's erroneous decision to re-categorize IPI's facility as a Type III facility is based on an incorrect interpretation of Louisiana's solid waste regulations and "wrongfully allows [IPI] to process residential and commercial waste within a 200-foot buffer zone meant to separate facility operations from the Oakville community."

II. ANALYSIS

A. Contentions of the Parties
Pursuant to IPI's Type II-A standard permit, the Oakville plaintiffs contend that IPI was required to maintain a 200-foot buffer zone. The Oakville plaintiffs assert that IPI unlawfully constructed its waste processing facility within 95 feet of its property line and that LDEQ has never taken action to address this buffer zone violation. The Oakville plaintiffs assert that LDEQ simply reclassified the Type II-A waste processing facility as a Type III facility to resolve the non-compliance issue since the Type III categorization only requires a 50-foot buffer zone. The Oakville plaintiffs posit that the regulations categorize facilities based on the type of waste processed and that IPI is a Type II-A facility because it processes commercial and residential waste. The Oakville plaintiffs urge that because IPI's waste processing operations involve wastes entering the facility in containers on trucks and the placement of waste in other vehicles for shipment off-site to authorized disposal or recycling facilities, it should be considered a Type II-A transfer station.
LDEQ argues that because separation facilities were not separately regulated in 1991, IPI's separation facility was initially permitted under the then-existing definition for a transfer station. It urges that when LDEQ amended Louisiana's solid waste regulations to satisfy the requirements of RCRA, the new regulations added a separation facility as a new type of permitted facility. LDEQ urges that based on the revised regulations, the operations and activities at IPI's separation facility no longer meet the definition of a transfer station. It asserts that the operations of the separation facility fall squarely within the Type III category of facilities and specifically fit the state's regulatory definition of a separation facility. LDEQ also submits that although the definition of a separation facility does not limit the types of waste coming into the facility, the Type III permit issued to IPI specifically limits the type of waste allowed into the facility and prohibits the receipt of hazardous waste.
IPI contends that the Oakville plaintiffs ignore that the revised solid waste regulations delineate separation facilities as Type III facilities. IPI asserts its facility is a separation facility because it conducts recycling activities by separating recyclables from a solid waste stream, and because it is not simply transferring waste between *183 vehicles. IPI states, "[W]aste is received [at the facility] and transferred to the picking line where workers remove [recyclable materials]. Residual non-recyclable material either goes to the on-site C & D landfill if applicable, or to an off-site permitted landfill for disposal." (Footnote references omitted). IPI asserts that if this court were to accept the Oakville plaintiffs' contentions, every waste facility would be classified as a transfer facility "since essentially all waste facilities collect and transport waste as it is being handled and moved."

B. Standard of Review
The applicable standard for our appellate review is set forth as follows:
Louisiana Revised Statute 30:2050.21 sets forth the procedure for judicial review of a final permit decision of the [LDEQ]. Judicial review provisions of the Administrative Procedure Act and its standard of review are applicable to [LDEQ] proceedings. LSA-R.S. 30:2050.21(F). Judicial review is conducted by the court without a jury and is confined to the record. LSA-R.S. 49:964(F).
When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. The Nineteenth Judicial District Court is vested with exclusive jurisdiction to review final permit actions, final enforcement actions, or declaratory rulings made by the [LDEQ]. LSA-R.S. 30:2050.21(A). Any party aggrieved by a final judgment or interlocutory order or ruling of the Nineteenth Judicial District Court may appeal or seek review to this court. LSA-R.S. 30:2050.31.
A reviewing court may affirm the decision of the agency or remand the case for further proceedings. LSA-R.S. 49:964(G). The court may reverse or modify an agency decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) not supported and sustainable by a preponderance of the evidence as determined by the reviewing court.
Dow Chemical Co. Louisiana Operations Complex Cellulose and Light Hydrocarbons Plants, Part 70 Air Permit Major Modifications and Emission v. Reduction Credits, 03-2278, pp. 6-7 (La.App. 1st Cir.9/17/04), 885 So.2d 5, 10, writ denied, 04-3005 (La.2/18/05), 896 So.2d 34. (Citations omitted.)

C. Categorization of the Facility
In the present case, the issue presented is simply whether the LDEQ and the district court committed an error of law in categorizing IPI's facility as a Separation Facility under the applicable solid waste regulations.
In 1991, when DEQ issued IPI's Standard Permit, P-0261, Louisiana's solid waste regulations did not separately regulate separation facilities and did not define or otherwise categorize separation facilities. Louisiana Administrative Code title 33, part VII, § 501 then broadly defined a "Transfer Station" as "a type of facility for accumulation and processing of solid waste for re-shipment or resale, or for processing for waste reduction, resource recovery, or other similar activities." (Emphasis added.) "Process" was defined as "to recycle, recover, compact, shred, or otherwise convert solid waste to a useful form or a form more convenient to handle, or *184 for reshipment or resale." (Emphasis added.) La. Admin. Code tit. 33, part VII, § 501. And "Resource Recovery" was defined as "the process by which materials subject to these regulations which still have useful physical or chemical properties are reused or recycled for the same or other purposes, including uses as an energy source." La. Admin. Code tit. 33, part VII, § 501.
Under the current solid waste regulations, as revised in 1993, a "Transfer Station" is defined as "a solid waste processing facility where solid waste is transferred from collection vehicles and placed in other vehicles for transportation." The 1993 revision also added a definition for "Separation Facility," a term which the solid waste regulations had not previously defined. It is now defined as "a solid waste facility at which recyclables are separated from the solid waste stream for future use." La. Admin. Code tit. 33, part VII, § 115.
Also relevant is that under the revised solid waste regulations, Type II-A facilities are defined as "a facility used for processing residential, infectious, or commercial solid waste (e.g., transfer station, incinerator waste-handling facility, refuse-derived fuel facility, shredder, baler, autoclave, or compactor). (If the facility is also used for processing industrial solid waste, it is also a Type I-A facility.)" La. Admin. Code tit. 33, part VII, § 115. And Type III facilities are defined as "a facility used for disposing or processing of construction/demolition debris or woodwaste, composting organic waste to produce a usable material, or separating recyclable wastes (a separation facility). Residential, commercial, or industrial solid waste must not be disposed of in a Type III facility." La. Admin. Code tit. 33, part VII, § 115. (Emphasis added.)[7]
In its final permit application, IPI addressed the types of waste processed at its facility as follows:
The facility receives, separates, and sells non-industrial, non[-] hazardous materials for reclamation such as paper, paper products, metal, and glass. The receipt of hazardous waste, mercury and/or cadmium-bearing batteries, PCBs, asbestos, incinerator ash, infectious waste, domestic sewage sludge, industrial solid waste, hazardous waste, or nonhazardous petroleum-contaminated media and debris generated from underground storage tank corrective action activities is strictly prohibited. The facility does not accept industrial waste.
...
... Except for incidental amounts of putrescible waste inadvertently included with waste loads, IPI separates only nonputrescible wastes with a recoverable amount of recyclable material including steel, cardboard, aluminum, plastic, *185 and any other material with a value when recovered. Typical waste sources... include waste from appliance stores, office buildings, hardware/lumber stores/distributors, department stores, and construction and demolition (C & D) debris with a visible volume of recyclables.
Exhibits attached to IPI's application specified that sources of waste separated at the facility include customers primarily located in Plaquemines, Jefferson, Orleans, and St. Bernard Parishes. IPI further described that its facility segregates wastes by type into the following categories: 1) waste that can be reclaimed and sold; 2) waste that can be landfilled at a construction debris landfill; 3) waste that cannot be recycled or disposed of in a construction debris landfill and will be sent to a type II permitted solid waste facility; and 4) tires, oil, refrigerant, and other wastes/materials that must be managed in accordance with special requirements and are shipped off-site to an authorized facility for disposal or recycling.
IPI's final permit application also included the following description of proposed modifications to its existing facility for recycling operations:
Riverside Recycling and Disposal is proposing (1) to augment and enhance a recycling facility or separation facility that separates recyclable materials from trash taken from office buildings, shopping malls, and other commercial establishments....
The modification of the existing recycling facility includes the addition of 11,000 square feet of an enclosed area that will house the enhanced recycling operations. A new 85 foot long picking station with 10 persons servicing the picking station will be built in this area, as well as one rotary screen, one shredder, one eddy current system, two magnets, and assorted feeder belts. This facility will recycle steel, non-ferrous metal, and mixed grades of paper and cardboard. Recycled steel will be sold directly to steel mills; non-ferrous metals will be sold to secondary smelters; and, paper items will be sold to paper mills. Riverside Recycling & Disposal is the only company recycling non-separated trash in the New Orleans area.
One of RCRA's stated objectives is to promote "new and improved methods of collection, separation, and recovery, and recycling of solid wastes." 42 U.S.C. § 6902(a)(9). Louisiana's Solid Waste Management and Resource Recovery Law, La. R.S. 30:2151 et seq. ("Resource Recovery Law"), also promotes recycling through a coordinated statewide resource recovery and management program.
With this objective in mind and based upon a close review of the documents describing IPI's facility operations, we find that the district court correctly affirmed LDEQ's decision to issue a Type III permit to IPI for its Separation Facility. Based on all pertinent descriptions of IPI's operations, IPI's Separation Facility separates recyclable waste; the definition of a Type III facility includes such a separation facility. The record further establishes that IPI's Separation Facility does not dispose of any type of waste; rather it accepts and processes waste. The purpose and function of the facility is to separate waste so that recyclable wastes can be recovered.
Accordingly, we decline to accept the Oakville plaintiffs' contention that because separated waste is placed in vehicles for shipment to off-site facilities after it is processed at IPI's facility, the facility should be categorized as a Type II-A transfer station. Such an interpretation of the regulations would clearly frustrate the goals of RCRA and our state's Resource Recovery Law. Likewise, a companion goal of protecting our environment against contamination *186 is reached by the terms of the Type III permit; the incoming solid waste stream at IPI's Separation Facility is limited and restricted by the terms of the LDEQ permit.
We also reject the Oakville plaintiffs' contentions that the categorization is strictly based on the type of waste processed. The definition of a Type III facility is not contingent upon a facility that processes a certain type of waste. The Type III facility definition is broadly drafted to include all separation facilities.
A state agency is charged with interpreting its own rules and regulations and great deference must be given to the agency's interpretation. In the Matter of Recovery I, Inc., 93-0441 (La.App. 1st Cir.4/8/94), 635 So.2d 690, 696, writ denied, 94-1232 (La.7/1/94), 639 So.2d 1169. After reviewing and considering all public comments, reviewing the IT responses set forth in IPI's application, reviewing the entire record, and conducting its own IT analysis, LDEQ determined the Separation Facility was properly classified as a Type III waste management facility.[8] The district court properly afforded deference to LDEQ's determination regarding the facility's categorization. We find no error of law in the findings of LDEQ or the district court, we find the categorization of IPI's facility as a Type III facility is supported by a preponderance of the evidence, and we find that LDEQ's findings are not arbitrary or capricious or characterized by an abuse of discretion. Because we conclude that IPI's facility was properly permitted as a Type III facility, we further conclude that, under the applicable regulations, the facility is only required to maintain a 50-foot buffer zone.

III. CONCLUSION
For the above reasons, we find no merit in the assignment of error raised by the Oakville plaintiffs, and we conclude that the district court properly affirmed LDEQ's January 7, 2004 renewal of IPI's Type III Separation Facility permit, P-0261R1, and its re-issuance of the permit with revised conditions on August 25, 2004. Appeal costs are assessed against the Oakville plaintiffs.
AFFIRMED.
GUIDRY, J., concurs.
NOTES
[1] In a separate petition for judicial review in the Nineteenth Judicial District Court, Nancy Fridge and Thomas Rhodes, who are both residents of Oakville, Louisiana, also sought to have LDEQ's January 7, 2004 permit action and its August 25, 2004 revised permit vacated. The proceeding filed by Fridge and Rhodes was consolidated with the proceeding filed by the Oakville plaintiffs. Although the district court's April 8, 2005 judgment considered on appeal disposed of the claims pending in both proceedings, Fridge and Rhodes have not appealed.
[2] The Oakville plaintiffs do not raise any issues in this appeal concerning whether the C & D Landfill has been properly categorized under Louisiana's Solid Waste Regulations. Therefore, subsequent references to IPI's facility refer only to its Separation Facility.
[3] EPA approved the LDEQ's solid waste regulations on November 4, 1993. 58 Fed.Reg. 58,860 (November 4, 1993).
[4] Type II-A facilities were required to upgrade in accordance with the regulations no later than December 31, 1997. La. Admin. Code tit. 33, part VII, § 315(G)(3)(b).
[5] LDEQ's notice of intent to revoke stated, "At the time of the permit application submittal containing the waiver of buffer zone, the legal owners of property adjacent to [IPI's] transfer station were the heirs of Eckard Johnson, Sr., who died February 17, 1987. . . ." The signature on the waiver form was spelled "Eckerd," rather than "Eckard," and Mr. Johnson's heirs had asserted it was a forgery. The notice of intent also stated, "The waiver is also defective for the reason that it was confected for a burner rather than a transfer station."
[6] Louisiana Revised Statutes 30:2024 provides the basis for this hearing.
[7] Further, Louisiana Administrative Code title 33, part VII, § 115 includes the following pertinent definitions:

Commercial Solid Wasteall types of solid waste generated by stores, offices, restaurant, warehouses, and other nonmanufacturing activities, excluding residential and industrial solid wastes.
Infectious Wastewaste that contains pathogens of sufficient virulence and quantity that exposure to it could result in an infectious disease in a susceptible host.
Processa method or technique, including recycling, recovering, compacting ... composting, incinerating, shredding, baling, recovering resources, pyrolyzing, or any other method or technique designed to change the physical, chemical, or biological character or composition of a solid waste to render it safer for transport; reduced in volume; amenable for recovery, storage, reshipment, or resale....
Residential Solid Wasteany solid waste (including garbage, trash, and sludges from residential septic tanks and wastewater treatment facilities) derived from households....
[8] In the "IT decision," Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984), the Louisiana Supreme Court set forth a number of factors to be considered by LDEQ when employing a cost-benefit analysis to determine whether to grant or deny a permit for a proposed facility. LDEQ's January 7, 2004 Basis for Decision sets forth an extensive analysis pursuant to the "IT" requirements. As part of this analysis, LDEQ concluded, "[A]dverse environmental impacts have been minimized or avoided as much as possible consistently (sic) with the public welfare." On appeal, the Oakville plaintiffs do not raise any assignments of error pertaining to LDEQ's analysis of the IT factors.